**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Dalia Spina, | ) No. CV 05-0712- PHX-SMM |
| | ) |
| Plaintiff, | ) **MEMORANDUM OF DECISION AND ORDER** |
| | ) |
| v. | ) |
| | ) |
| Maricopa County Department of Transportation, a Political Subdivision of Maricopa County, | ) |
| | ) |
| Defendant. | ) |
| | ) |

Before the Court is Defendant Maricopa County Department of Transportation's Motion for Summary Judgment (Doc. 126).[1] Plaintiff Dalia Spina filed a response (Doc. 130), and Defendant replied (Doc. 128). Neither party has requested oral argument, and the Court finds the pending motion for summary judgment suitable for decision without oral argument. Having considered the parties' briefing and other submissions, the Court now issues this Memorandum of Decision and Order granting in part and denying in part Defendant's motion.

---

[1]Defendant previously submitted a summary judgment motion on October 21, 2008 (Doc. 112). On May 19, 2009, the Court denied Defendant's motion with leave to refile because both parties had failed to include pinpoint citations to their respective statements of fact in their briefing, in violation of Local Rule 56.1(e) (Doc. 125). Plaintiff and Defendant were given a deadline of June 19, 2009 to resubmit their summary judgment briefing with the requested pinpoint citations (Id.). The parties were ordered not to change their briefing substantively (Id.). Both parties complied with the Court's deadline and resubmitted their briefing on June 19, 2009.

# FACTUAL BACKGROUND

In February 1999, Dalia Spina ("Plaintiff") began working for Maricopa County Department of Transportation ("Defendant") as an exempt, at-will employee (Doc. 127, Def's Statement of Facts ("DSOF") ¶ 1). She worked in web design and development, and her immediate supervisor was Terry Peterson ("Peterson") (Id. ¶¶ 2-3). On August 31, 2001, Plaintiff received a "needs improvement" employee evaluation which stated that she needed to improve her project management skills, complete tasks on time, follow directions, and improve her team work skills (Id. ¶¶ 4-6; Doc. 127, Ex. 4).

On September 7, 2001, while under the supervision of Peterson, Plaintiff submitted a complaint of gender discrimination to Maricopa County Human Resources (DSOF ¶ 8; Doc. 127, Ex. 5). Beginning on September 14, 2001, Plaintiff was placed on paid administrative leave while her discrimination charge was investigated by Defendant (DSOF ¶ 9; Doc. 127, Ex. 6). Shortly after she was placed on administrative leave, Plaintiff filed a charge of gender discrimination ("First Charge") with the Equal Employment Opportunity Commission on October 3, 2001 ("EEOC") (DSOF ¶ 11; Doc. 127, Ex, 8; Doc. 116, Pl's Statement of Facts ("PSOF") ¶ 1).[2]

When Defendant determined that the charge was unfounded, Plaintiff was ordered to return to work, but in a different department, and under the supervision of Roger Ball ("Ball") (DSOF ¶ 10; Doc. 127, Ex. 7). On April 17, 2002, Plaintiff returned to work under

---

[2]On March 28, 2003, the EEOC issued a reasonable cause determination as to the First Charge (DSOF ¶ 12; Doc. 127, Ex. 9; PSOF ¶ 2). Later, on February 26, 2004, Plaintiff received a right to sue letter on her charge of gender discrimination that informed her that "suit must be filed in the appropriate court within 90 days of [her] receipt of th[e] Notice." (DSOF ¶ 13; Doc. 127, Ex. 10). Plaintiff did not sue Defendant until March 7, 2005, outside the ninety (90) day period specified in the right to sue letter (Doc. 1, Compl.). In its summary judgment motion, Defendant argues that any of Plaintiff's claims based upon this October 3, 2001 EEOC charge are time barred, and thus, Defendant is entitled to summary judgment on any claims based upon these allegations (Doc. 126, 11:18-12:17). Plaintiff herself concedes that the 2001 EEOC charge is not at issue in this case (Doc. 130, 3:5-8, 9:22-26). Therefore, the Court will only consider Plaintiff's third EEOC charge alleging sex discrimination and retaliation, filed November 2, 2004.

the supervision of Ball (PSOF ¶ 3). Early on in his supervision of Plaintiff, Ball learned that Plaintiff had made allegations against her previous supervisor, Peterson (Id.). Ball documented his interactions with Plaintiff because she "had problems before." (Id. ¶ 4) Additionally, Ball consulted with human resources, other superiors, and the county attorney about Plaintiff (Id. ¶ 5).

On Plaintiff's November 12, 2002 performance evaluation, Ball gave Plaintiff a Rating of "G" which represented "Good Solid Performance - Fully met expectations in all prioritized areas of performance plan." (Id. ¶ 8; Doc. 116, Ex. 8).[3] Then on June 24, 2003, Plaintiff attended a "Tom's Town Hall" meeting ("TTH") led by the director of Maricopa County Department of Transportation, Tom Buick, where a variety of transportation issues were discussed (PSOF ¶ 9). During the meeting, Plaintiff voiced criticisms of Defendant's OATTN program (Id.). Ball had Plaintiff's statements partially transcribed (Id.). After her remarks at the TTH meeting, Plaintiff was counseled by Ball that she had failed to show proper deference to Department of Transportation officials in her comments and that she had purported to speak for others without any evidence of their agreement with her statements (Id. ¶ 10). Plaintiff's subsequent performance evaluation on July 20, 2003 was lower than her 2002 review (Id. ¶ 11; DSOF ¶ 14-15; Doc. 127, Ex. 11).[4] Plaintiff received a rating of "P" which represented "Partially Meets Performance Expectations - Did not fully meet expectations. Needs to improve by next rating period." (Id.)

As a result of Ball's constant criticism and mistreatment, Plaintiff filed a second Charge of Discrimination ("Second Charge"), on November 17, 2003, in which Plaintiff alleged retaliation (PSOF ¶ 6; Doc. 116, Ex. 6).

Next, on December 22, 2003, Plaintiff attended an "All Hands" meeting concerning allegations of violations of county merit and recruitment rules by the OATTN program (PSOF ¶ 13). Plaintiff was off work that day and her interest in attending the meeting was

---

[3]The evaluation was for a partial year, from July 2, 2002 to October 31, 2002.

[4]The evaluation was an annual one, covering the period July 2, 2002 to June 30, 2003.

not connected to any of her job responsibilities (Id.). However, Ball was concerned over Plaintiff's attendance and a conversation between Plaintiff and a high-level county official, Joy Rich, at the meeting (Id.). Since Ball was a supporter of the OATTN project, he was disappointed when Defendant later abandoned it (Id. ¶ 14).

In 2003, Ball started requiring Plaintiff to check out when she left each day, although he did not impose the same requirement on other employees (Id. ¶ 15). Despite Ball's criticism of Plaintiff, others praised her work and expressed appreciation for her assistance with projects (Id. ¶ 17; Doc. 116, Ex. 17). Ball criticized Plaintiff for seeking work from other departments without securing approval from him (PSOF ¶ 18). Ball's supervisor, Michael Sabatini ("Sabatini"), advised Plaintiff to have those people who wanted to use her services make a formal request with Ball (Id.).

On June 29, 2004, Plaintiff was given two written warnings by Ball (DSOF ¶ 68; Doc. 127, Ex. 13,16; PSOF ¶ 19).[5] Both warnings had been prepared by human resources, and then reviewed and signed by Ball (PSOF ¶ 19). Although Plaintiff had followed Sabatini's advice to secure approval of work from other departments, Ball and Sabatini cited Plaintiff's solicitation of work from other departments as a reason for her termination (Id. ¶ 21). Sabatini trusted Ball's judgment and thus, agreed with his decision to terminate Plaintiff (Id. ¶ 23). Despite Plaintiff's claim that Ball was retaliating against her for filing an EEOC charge and publicly criticizing Defendant, Sabatini did not investigate Plaintiff's retaliation claim himself (Id.).

After filing the Second Charge, the mistreatment continued until Plaintiff's eventual termination on October 12, 2004 (PSOF ¶ 7; DSOF ¶ 72; Doc. 127, Ex. 18-19). After her termination, Plaintiff filed a third charge with the EEOC on November 2, 2004, in which she

---

[5]Another warning later was issued to Plaintiff on July 22, 2004 (Doc. 127, Ex. 14). The warning stated that Plaintiff could not take credit on her personal website, www.dalia.com, for work on projects that she did not complete (Id.). It also directed Plaintiff to remove all sites showing Maricopa County agencies or departments from her personal website and stated that failure to do so would result in disciplinary action (Id.).

- 4 -

alleged sex discrimination and retaliation ("Third Charge") (PSOF ¶ 7; Doc. 116, Ex. 7). On December 7, 2004, EEOC issued a Right to Sue Letter as to this Third Charge (Doc. 47, 2d Amend. Compl. ¶ 20). It is this Third Charge that forms the basis for Plaintiff's claims of discrimination and retaliation in the present case.

## PROCEDURAL BACKGROUND

On March 7, 2005, Plaintiff brought this action against Maricopa County Department of Transportation and Co-Defendant Ball (Doc. 1).[6] The suit was timely filed as it was within ninety (90) days of the issuance of the Right to Sue Letter by the EEOC on December 7, 2004. Plaintiff later filed a Second Amended Complaint on October 6, 2006, alleging five claims, including the following: Count one alleges sex discrimination in violation of 42 U.S.C. § 2000e (Compl. ¶¶ 21-24), count two alleges hostile work environment in violation of 42 U.S.C. § 2000e (Compl. ¶¶ 25-29), count three alleges retaliation in violation 42 U.S.C. § 2000e (Compl. ¶¶ 30-34), count four alleges a breach of 42 U.S.C. § 1983 (Compl. ¶¶ 35-39), and count five alleges intentional infliction of emotional distress. (Compl. ¶¶ 40-44). Plaintiff seeks relief in the form of both compensatory and punitive damages.

## STANDARD OF REVIEW

A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the nonmoving party, "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); see Celotex Corp v. Catrett, 477 U.S. 317, 322-23 (1986); Jesinger v. Nev. Fed. Credit Union, 24 F.3d 1127, 1130 (9th Cir. 1994). Substantive law determines which facts are material. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Jesinger, 24 F.3d at 1130. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. The dispute must also be genuine, that is, the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." Id.

---

[6] Ball was later dismissed without prejudice by the Court on May 2, 2005 (Doc.8).

A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." Celotex, 477 U.S. at 323-24. The movant on a summary judgment motion bears the initial burden of providing a legal basis for its motion and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. Id. at 323. Summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322; see also Citadel Holding Corp. v. Roven, 26 F.3d 960, 964 (9th Cir. 1994). The moving party need not disprove matters on which the opponent has the burden of proof at trial. See Celotex, 477 U.S. at 323-24.

If the moving party meets its burden, the party opposing summary judgment "may not rely merely on allegations or denials of its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Brinson v. Linda Rose Joint Venture, 53 F.3d 1044, 1049 (9th Cir. 1995). All inferences drawn from the evidence must be viewed in the light most favorable to the non-moving party, Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992), but inferences must be based on evidence which, if believed, would be sufficient to support a judgment for the nonmoving party. Celotex, 477 U.S. at 322. Moreover, inferences cannot be created by pointing to "some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586 (citations omitted). Rather, deference to the nonmoving party has limits: (i) a plaintiff cannot rest on allegations in his pleadings to overcome a motion for summary judgment (Brinson, 53 F.3d at 1049); and (ii) self-serving affidavits do not establish a genuine issue of material fact if they fail to state facts based on personal knowledge or are too conclusory (Rodriguez v. Airborne Express, 265 F.3d 890, 902 (9th Cir. 2001)).

## DISCUSSION

Defendant seeks summary judgment on Plaintiff's claims of sex discrimination, hostile work environment, retaliation, section 1983 violation, and intentional infliction of

emotional distress, asserting that Plaintiff has presented no evidence to support her various claims.[7]

## A.    Sex Discrimination (Count I)

Although Count I of Plaintiff's Second Amended Complaint alleged sex discrimination, Plaintiff in her response concedes that this claim should be dismissed (Doc. 130, 9:22-26). Plaintiff's allegations of sexual harassment date back to 2001. A claim based on events occurring within that time frame was never made, and thus, would be untimely if brought now. Therefore, the Court will dismiss Count I.

## B.    Hostile Work Environment (Count 2)

Plaintiff alleges that a hostile work environment existed based on retaliation (Doc. 130, 6:26-7:5). In support of this claim, Plaintiff points to the following retaliatory acts:

a) After Plaintiff attended the TTH meeting on June 24, 2003 and voiced criticisms of Defendant's OATTN program, she was counseled by Ball that she had failed to show proper deference in her comments and had purported to speak for others without any evidence of their agreement with her comments (PSOF ¶¶ 9-10). The counseling also followed the EEOC's reasonable cause determination on March 28, 2003 as to Plaintiff's First Charge of discrimination (Id. ¶ 2).

b) Plaintiff's July 20, 2003 performance evaluation was lower than her 2002 review (Id. ¶ 11). In 2002 Plaintiff received a rating of "G" for "Good Solid performance." (Id. ¶ 8) However, in 2003, she received a rating of "P" for "Partially Meets Performance Expectations." (Id. ¶ 11)

---

[7]Defendant begins its summary judgment motion by asserting that Plaintiff was an at-will employee and could therefore be terminated with or without cause. Title VII protects at-will employees from unlawful discrimination the same as any other employee. Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 350 n.2 (3d Cir. 1999); Achor v. Riverside Golf Club, 117 F.3d 339, 341 (7th Cir. 1997). Similarly, claims pursuant to 42 U.S.C. § 1983 based upon First Amendment violations do not require a property interest in the employment. Perry v. Sindermann, 408 U.S. 593, 596-98 (1972).

c) In 2003, Ball started requiring Plaintiff to check out when she left each day, even though he did not impose the same requirement on other employees (Id. ¶ 15).

d) Ball criticized Plaintiff for seeking work from other departments without securing prior approval from him (Id. ¶ 18).

e) On June 29, 2004, Plaintiff was given two written warnings by Ball (Id. ¶ 19). Before examining the merits of Plaintiff's hostile work environment claim, the Court determines which of these acts can be considered and which are time-barred, if any.

### 1. Timeliness of Claim

Section 2000e-5(e)(1) mandates that a Title VII claimant file a charge with the EEOC within 300 days "after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). "An individual must file a charge within the statutory time period," otherwise, his or her claim is barred. Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 109 (2002). "By choosing what are obviously quite short deadlines, Congress clearly intended to encourage the prompt processing of all charges of employment discrimination." Mohasco Corp. v. Silver, 447 U.S. 807, 825 (1980).

In Morgan, the Supreme Court addressed the issue of when an "unlawful employment practice" occurs for purposes of Title VII's 300 day time limitation. 536 U.S. at 110. The Court made an important distinction between "discrete" discriminatory acts and "hostile work environment claims." With hostile work environment claims, "The 'unlawful employment practice' . . . therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." Id. at 115 (citation omitted). Because a series of acts that create the hostile environment collectively constitute one unlawful employment practice under Title VII, an employee timely files an EEOC charge if the employee files the charge within 300 days of one of the acts that constitute part of the hostile work environment claim. "Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." Id. at 117.

The Supreme Court held that it did not matter that some of the acts comprising the hostile work environment fell outside the statutory time period. Id. Rather, "a charge alleging a hostile work environment claim, . . . will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." Id. at 122. While not independently actionable, discrete acts outside the 300 day period "still may be considered for purposes of placing non-discrete acts in the proper context." Porter v. Cal. Dep't of Corrs., 419 F.3d 885, 893 n.4 (9th Cir. 2005) (citing Morgan, 536 U.S. at 113); see also McGinest v. GTE Serv. Corp., 360 F.3d 1103, 1108, 1113-14 (9th Cir. 2004) (considering discriminatory failure to pay overtime two years before charge filed as part of hostile environment claim).

In the present case, Plaintiff filed her Third Charge with the EEOC on November 2, 2004. Thus, under 42 U.S.C. § 2000e-5(e)(1), only acts that occurred after January 7, 2004 fall within the 300 day statutory time period. Plaintiff has identified acts supporting a hostile work environment claim where at least one act falls within the filing period of the third EEOC charge. Therefore, the entire time period of the hostile environment, including acts that occurred outside the 300 day period, can be considered when determining Defendant's liability. Morgan, 536 U.S. at 117. The acts occurring outside the statutory period include the private counseling session following Plaintiff's remarks at the TTH meeting on June 24, 2003, the lowered performance evaluation on July 20, 2003, and the requirement that Plaintiff check in and out daily.

2.    Merits of Claim

Although unusual in the retaliation context, the Ninth Circuit has held that a hostile work environment may be the basis for a retaliation claim under Title VII. Ray v. Henderson, 217 F.3d 1234, 1244-45 (9th Cir. 2000).[8] "A hostile work environment can be

---

[8]The Ninth Circuit's holding that a hostile work environment may be the basis for a Title VII retaliation claim is in accord with the Second, Seventh, and Tenth Circuits. See e.g., Richardson v. N.Y. State Dep't of Corr. Serv., 180 F.3d 426, 446 (2d Cir. 1999) ("co-worker harassment, if sufficiently severe, may constitute adverse employment action so as

the basis for a retaliation claim if the harassment is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Hale v. Haw. Publ'ns, Inc., 468 F.Supp.2d 1210, 1225 (D. Haw. 2006) (quoting Ray, 217 F.3d at 1245). Courts are to determine whether an environment is sufficiently hostile by "looking at all the circumstances," including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993). "Not every insult or harassing comment will constitute a hostile work environment." Ray, 217 F.3d at 1245. Numerous insults or harassing comments, however, may comprise a hostile work environment. Id.

An employer can be held vicariously liable to a victimized employee for an actionable hostile work environment created by a supervisor with immediate (or successively higher) authority over the employee. Burlington Indus. v. Ellerth, 524 U.S. 742, 765 (1998). A supervisor's conduct can be attributed directly to the employer, since the employer is the one who cloaks the supervisor with authority. Id.

The plaintiff in Ray complained of gender bias in the workplace. 217 F.3d at 1237, 1245. The plaintiff's complaint spurred a meeting where one of the plaintiff's supervisors publicly announced his displeasure with the complaint and that as a result he may change his management style. Id. at 1237-38. This supervisor later canceled employee meetings as long as the plaintiff continued to write letters "over [his] head." Id. at 1238. Several supervisors publicly berated the plaintiff on a regular basis, calling the plaintiff a "rabblerouser" and "troublemaker." Id. In addition, the supervisors forced the plaintiff to start his work day later, which forced him to work faster (at "top speed"), harder, later, and to "be supervised

---

to satisfy the second prong of the retaliation *prima facie* case") (emphasis in original); Drake v. Minn. Mining & Mfg. Co., 134 F.3d 878, 886 (7th Cir. 1998) ("retaliation can take the form of a hostile work environment"); Gunnell v. Utah Valley State Coll., 152 F.3d 1253, 1264 (10th Cir. 1998) ("co-worker hostility or retaliatory harassment, if sufficiently severe, may constitute 'adverse employment action' for purposes of a retaliation claim").

at all times." Id. at 1238-39. The supervisors also falsely charged the plaintiff with misconduct as well as played a series of pranks on him. Id. at 1238. Later, the plaintiff's work load was reduced, causing a decrease in his salary. Id. at 1239.

The Ninth Circuit found a genuine issue of material fact was raised concerning a retaliatory hostile work environment because the evidence showed that plaintiff was subjected to repeated verbal abuse and pranks, disadvantageous changes in rules and management styles, a salary reduction, and false accusations of misconduct. Id. at 1237-39, 1245-46; see also Black v. City and County of Honolulu, 112 F.Supp.2d 1041, 1051-52 (D. Haw. 2000) (finding evidence of a threatening note, repetitive phone calls, 24-hour surveillance, releasing private information to the media, and wire tapping the employee's pager enough to raise a genuine issue of material fact that a hostile work environment based on retaliation existed).

Despite Plaintiff's allegations that she endured a pattern of harassment that amounted to a retaliatory hostile work environment, she has not demonstrated a genuine factual dispute as to this claim. As noted above, to establish a hostile work environment under Title VII, a plaintiff must show that a defendant's conduct was "so 'severe or pervasive' as to 'alter the conditions of [her] employment and create an abusive working environment.'" Montero v. AGCO Corp., 192 F.3d 856, 860 (9th Cir. 1999) (quoting Meritor Savs. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)). After considering the evidence in the light most favorable to Plaintiff, the Court finds that Defendant's conduct was not sufficiently severe or pervasive.

Defendant's conduct was infrequent and Plaintiff's one *private* counseling to warn her not to be disrespectful and to show proper deference in the future (PSOF ¶ 10) contrasts from Ray, where the plaintiff was insulted and humiliated in front of his co-workers on numerous occasions. In addition, Plaintiff received one lowered job performance evaluation and about one year later received two written warnings(Id. ¶¶ 11, 19) Again this contrasts from Ray, where the plaintiff was subjected to *repeated* verbal abuse, pranks, and false accusations of misconduct. The conduct in Ray was frequent and humiliating, whereas the conduct in the

instant case was infrequent and done privately between the supervisor and the subordinate, without humiliation.

Furthermore, the Court finds that the alleged conduct did not unreasonably interfere with Plaintiff's work performance. From the perspective of a "reasonable woman," the Court considers whether Defendant's conduct "'unreasonably interferes with work performance' and, consequently, 'can alter a condition of employment and create an abusing working environment.'" See Craig v. M & O Agencies, Inc., 496 F.3d 1047, 1056-57 (9th Cir. 2007) (citing Ellison v. Brady, 924 F.2d 872, 877 (9th Cir. 1991) and Steiner v. Showboat Operating Co., 25 F.3d 1459, 1463 (9th Cir. 1994)). "Conduct must be extreme to amount to a change in the terms and conditions of employment." Montero, 192 F.3d at 860 (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)). Unlike Ray, the conduct Plaintiff experienced did not cause her to work faster or harder. Plaintiff desired to start work later and in-turn leave after 6:00 p.m., for the convenience of avoiding traffic (Doc. 116, Ex. 3). Being restricted from starting work later may have inconvenienced Plaintiff, but it did not affect her job performance, whereas restricting the plaintiff in Ray from arriving early caused him to work faster and harder. Moreover, obstructing Plaintiff from seeking work outside her department did not conflict with her own job duties.

Defendant's alleged conduct does not rise to the level of a hostile work environment based on retaliation. Plaintiff has presented no evidence that she was criticized for discriminatory reasons. Rather the evidence demonstrates that Plaintiff was criticized for her substandard work product, lack of respect, and insubordination (DSOF ¶¶ 4-6,14-16, 18-22, 25-27, 30-31, 38-44, 46-49, 51, 53-56, 58-61, 64-67). The prohibitions against working later than 6 p.m. and working for other departments were not imposed for discriminatory reasons either. Plaintiff was prevented from working late for safety and security reasons, and she was prevented from doing work for other departments due to her inability to get her assigned

work done (DSOF ¶ 57).[9]  Plaintiff has not shown her work environment was so severe or pervasive as to alter the terms and conditions of her employment and create an abusive working environment.  As such, her hostile work environment claim fails, and the Court will grant summary judgment for Defendant.

## C.    Retaliation (Count 3)

Plaintiff alleges that Defendant retaliated against her for making EEOC complaints (Doc. 130, 5:16-18).  Plaintiff states that this retaliation consisted of Ball blaming her for the problems with Peterson and treating her differently than other employees (Id. 6:13-15).  This different treatment included Ball consulting with superiors, human resources, and the county attorney early on in his supervision of Plaintiff (Id. 6:16-17).  Additionally, Ball gave Plaintiff a lower performance evaluation after Plaintiff filed her October 3, 2001 EEOC charge and spoke out at the TTH meeting (Id. 6:17-19).  Defendant contends that Plaintiff's retaliation claim is unsupported by the record which reveals that Ball's supervision of Plaintiff was based upon her poor performance and bad behavior, not any retaliatory motive (Doc. 128, 2:21-24, 3:16-19).

Before examining the merits of Plaintiff's retaliation claim, the Court first examines the timeliness of the claim and what discrete acts, if any, are time barred.

### 1.    Timeliness of Claim

As to discrete acts, the Court held that "a discrete retaliatory or discriminatory act 'occurred' on the day that it 'happened.'"  Morgan, 536 U.S. at 110.  Discrete acts include termination, failure to promote, denial of transfer, refusal to hire, or retaliatory adverse employment decisions.  Id. at 114.  Discrete incidents that occurred outside the 300 day time period are not actionable, even when the incidents are related to acts alleged in timely filed

---

[9]Ball testified at his deposition that safety and security, in addition to Plaintiff's ongoing actions against Maricopa County, were the reasons behind the prohibition against staying past 6 p.m. (Doc. 116, Ex. 15, Ball Dep. at 54:13-24).  Even if Defendant's prohibition was improper, isolated incidents cannot for the basis for a hostile work environment claim.  See Dominguez-Curry v. Nev. Transp. Dep't, 424 F.3d 1027, 1034 (9th Cir. 2005).

charges.  Id. at 113; see also Manatt v. Bank of Am., 339 F.3d 792, 800 (9th Cir. 2003) ("Because Manatt did not file the state complaint within 300 days of the transfer, her retaliation claim is untimely under Title VII.") (citations omitted).  An employee may file charges arising from related discrete acts so long as the acts are independently discriminatory or retaliatory and charges addressing those acts are themselves timely filed.  Morgan, 536 U.S. at 113.  Additionally, an employee can present evidence of time-barred acts as background evidence supporting a timely claim.  Id.

In Lyons v. England, the Ninth Circuit provided guidance as to how courts should determine what particular evidence of time-barred acts may be taken into account as "background" evidence of present, actionable discrimination.  307 F.3d 1092, 1109-11 (9th Cir. 2002).  The court held that the admissibility of evidence of discrete, time-barred acts of discrimination is controlled primarily by the Federal Rules of Evidence and its definition of relevance.  Id. at 1110.  Admissible background evidence must be relevant to determining the ultimate question of whether a defendant intentionally retaliated against the plaintiff because of her protected activity.

As noted above, Plaintiff filed her Third Charge with the EEOC on November 2, 2004.  Thus, under 42 U.S.C. § 2000e-5(e)(1), only acts that occurred after January 7, 2004 fall within the 300 day statutory time period.  The adverse employment actions alleged by Plaintiff, including two written warnings and her termination, are discrete acts that fall within 300 days of Plaintiff's November 2, 2004 EEOC charge.  The two written warnings were issued on June 29, 2004 followed by Plaintiff's termination on October 12, 2004 (PSOF ¶¶ 7, 19; DSOF ¶¶ 68, 72).  However, other acts relied upon by Plaintiff fall outside the statutory time frame and may be considered only as background evidence.  Morgan, 536 U.S. at 113. These acts include Ball's consultation with the county attorney and human resources and the lowered performance evaluation on July 20,2003 (PSOF ¶¶ 5, 11).  Plaintiff may not sustain a cause of action for relief from present injury caused by these time-barred acts of retaliation. However, Plaintiff may offer the evidence of Ball's consultation with the county attorney and lowered performance evaluation as indirect proof of Defendant's intent to

- 14 -

retaliate. This evidence may also be offered for its probative value in assessing whether Defendant's justifications for its present conduct lack credibility.

## 2. Merits of Claim

Plaintiff alleges retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Title VII makes it an unlawful employment practice for an employer to discriminate against an individual because she has opposed any employment practice made unlawful by Title VII, or because she has made a charge, testified, assisted, or participated in any manner in an investigation under Title VII. 42 U.S.C. § 2000e-3(a).

A Title VII case may be analyzed under either a single-motive or mixed-motive rubric. See Stegall v. Citadel Broad. Co., 350 F.3d 1061, 1072 (9th Cir. 2003). The Court analyzes Plaintiff's claim under a single-motive or "pretext" analysis first and then performs a mixed-motive analysis in the next section. In order to prevail in a single-motive Title VII case, the plaintiff must first establish a prima facie case of discrimination. If a plaintiff has shown a prima facie retaliation claim, then the burden shifts to the defendant to furnish a legitimate nondiscriminatory reason for its allegedly discriminatory conduct. Ray, 217 F.3d at 1240. If the defendant meets that burden, then the plaintiff bears the ultimate burden of demonstrating that the reason was merely a pretext for a discriminatory motive. Id.

### a. Prima Facie Case

To establish a prima facie retaliation claim under Title VII, an employee must show that (1) she engaged in a protected activity; (2) her employer subjected her to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action. Passantino v. Johnson & Johnson Consumer Prods., Inc., 212 F.3d 493, 506 (9th Cir. 2000) (citation omitted). To show the requisite causal link, the plaintiff must present sufficient evidence to raise an inference that the protected activity was the likely reason for the adverse action. Cohen v. Fred Meyer, Inc., 686 F.2d 793, 796 (9th Cir. 1982) (citations omitted).

### 1. Protected Activity

The parties do not dispute that Plaintiff engaged in protected conduct when she filed a charge with the EEOC alleging retaliation on November 17, 2003. As the statutory language of Title VII makes clear, filing a complaint with the EEOC is a protected activity. See 42 U.S.C. § 2000e-3(a); Ray, 217 F.3d at 1240.

### 2. Adverse Employment Action

Plaintiff claims that she suffered an adverse employment action when she received two written warnings and was involuntarily terminated within 300 days prior to the time she filed her final EEOC charge (Doc. 130, 5:18-20). Defendant issued two documents to Plaintiff on June 29, 2004. The first one, a Written Warning from Ball, cited "lack of respect for your coworkers and management personnel as well as your discourteous treatment of others." (Doc. 127, Ex. 13 p.1). The warning also gave specific examples of such conduct: (1) Plaintiff was overheard by coworkers referring to Ball and other Department of Transportation managers as "assholes"; (2) Plaintiff referred to Ball as "Roger No Balls" in a Department of Transportation vanpool;[10] (3) Plaintiff refused to return a collection of "first draft" books that had been loaned to her, preventing another employee from completing her work; (4) Plaintiff asked that an employee be removed from a video because "no one in Operations liked him"; and (5) Plaintiff referred to Ball as a "dick" and "two faced." (Id. p.1-2) This Written Warning was placed in Plaintiff's personnel file (Id. p.2).

The second document, a Written Warning/Action Plan, also came from Ball, and cited Plaintiff's continued unacceptable behavior, refusal to follow [Ball's] directions, and failure to improve her work performance (Doc. 127, Ex. 16 p.1). The specific examples given included the following: (1) Plaintiff failed to complete three required classes, as directed by her October 7, 2003 Performance Improvement Plan; (2) Plaintiff refused to complete certain tasks and assignments; (3) Plaintiff failed to obtain prior authorization from Ball before

---

[10]At her deposition, Plaintiff testified that she thought the phrase "Roger no Balls" was "funny" and although she did not remember calling him that name "it could have happened." (DSOF ¶ 45; Doc. 127, Ex. 3, Spina Dep. at 163:13-21)

working on projects for other departments; and (4) Plaintiff referred to Ball as an "asshole" and "Roger no Balls" and requested that another employee be removed from a video because "no one in Operations liked him." (Id. p.1-3) Plaintiff was directed to meet bi-monthly with Ball beginning on July 8, 2004 to discuss her progress in meeting expectations (Id. p.3).

Several months later, Plaintiff was terminated by Defendant, effective October 12, 2004 (Doc. 127, Ex. 18). The termination followed a pretermination meeting held on October 8, 2004 (Doc.127, Ex. 19). In an October 8, 2004 letter from Sabatini, multiple reasons were given for the termination including Plaintiff's failure to obtain prior approval for new projects, working past 6 p.m. without prior permission, and the failure of prior disciplinary actions to effect a behavioral change (Doc. 127, Ex. 18).

"The anti-retaliation provision [of Title VII] protects an individual not from all retaliation, but from retaliation that produces an injury or harm." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67 (2006). A plaintiff must show that the harm is "materially adverse" because "it is important to separate significant from trivial harms." Id. at 68. Thus, both the Ninth Circuit and the Supreme Court recognize an adverse employment action as "any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity." Ray, 217 F.3d at 1242-43; accord. Burlington N., 548 U.S. at 68. Defendant does not discuss adverse employment action in its briefing, and thus, it seemingly does not dispute that the two written warnings and termination are adverse employment actions reasonably likely to deter the charging party from engaging in protected activity. Burlington N., 548 U.S. at 68; see also Little v. Windermere Relocation, Inc., 301 F.3d 958, 970 (9th Cir. 2002)("[O]f course, termination of employment is an adverse employment action. . . ."); Payne v. Apollo Coll.—Portland, Inc., 327 F. Supp. 2d 1237, 1246-47 (D. Or. 2004) (written warnings created issue of fact whether plaintiff subjected to adverse employment action).

### 3. Causation

Plaintiff argues that she has shown the requisite nexus between her protected conduct and the warnings and termination she received (Doc. 130, 6:8-9). Plaintiff first relies on the

temporal proximity between the protected activity and the adverse employment action (Id. p. 5-6). Additionally, Ball allegedly knew about her first charge of discrimination, and it led him to consider her an employee "with problems before." (Id. 6:9-11; PSOF ¶ 4). Ball blamed Plaintiff for the problems with Peterson, and treated her differently than other employees (Doc. 130, 6:13-15). Moreover, Ball began consulting with superiors, human resources and the county attorney early on in his supervision of Plaintiff (Id. 6:16-17; PSOF ¶ 5). Furthermore, shortly after Plaintiff filed another charge and spoke out at the TTH meeting, Ball gave her a less than satisfactory performance evaluation (Doc. 130, 6:17-19; PSOF ¶¶ 8, 11). Importantly, each of the acts mentioned by Plaintiff as supporting causation fall outside the 300 day window for Plaintiff's November 2, 2004 EEOC charge. However, these acts may be considered as background evidence. Morgan, 536 U.S. at 113.

To establish causation, Plaintiff must show "by a preponderance of the evidence that engaging in the protected activity was one of the reasons for [her] firing [and warnings] and that but for such activity [she] would not have been fired [or warned]." Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1064-65 (9th Cir. 2002) (citing Ruggles v. Cal. Polytechnic State Univ., 797 F.2d 782, 785 (9th Cir.1986)). "In addition, the plaintiff must make some showing sufficient for a reasonable trier of fact to infer that the defendant was aware that the plaintiff had engaged in protected activity." Raad v. Fairbanks N. Star Borough Sch. Dist., 323 F.3d 1185, 1197 (9th Cir. 2003) (citing Cohen v. Fred Meyer, Inc., 686 F.2d 793, 796 (9th Cir.1982)).

Plaintiff first relies on the temporal proximity between the dates of Plaintiff's protected activity and Defendant's adverse employment actions. Proximity of time between protected activity and an adverse action may support an inference of causation. Ray, 217 F.3d at 1244. "Evidence based on timing can be sufficient to let the issue go to the jury, even in the face of alternative reasons proffered by the defendant." Passantino, 212 F.3d at 507 (citation omitted); see also Stegall, 350 F.3d at 1069 (finding evidence of a termination which occurred nine days after plaintiff's complaints sufficient to support retaliation claim)); Yartzoff v. Thomas, 809 F.2d 1371, 1376 (9th Cir. 1987) (causation was found from

proximity alone where the adverse actions occurred within three months after protected activity, two weeks after charge investigated, and less than two months after investigation ended); Miller v. Fairchild Indus., Inc., 885 F.2d 498, 505 (9th Cir.1989) (causation established when terminations occurred forty-two and fifty-nine days after EEOC hearings); cf. Villiarimo, 281 F.3d at 1065(refused to infer causation from proximity alone where adverse action occurred 18 months after the plaintiff's protected act). "It is [also] important to emphasize that it is *causation*, not temporal proximity itself, that is an element of plaintiff's prima facie case, and temporal proximity merely provides an evidentiary basis from which an inference can be drawn." Porter, 419 F.3d at 895 (emphasis added) (citing Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 178 (3d Cir. 1997)). Thus, the Court must look not only to timing but to all of the circumstances to determine whether an inference of causation is possible. See Coszalter v. City of Salem, 320 F.3d 968, 978 (9th Cir. 2003).

Plaintiff's EEOC charge was filed on November 17, 2003 and was not followed by an adverse action until the two warnings were issued on June 29, 2004, approximately seven months later. This extended gap of seven months between the protected activity and an adverse employment action is not close enough in time to support an inference of causation as in Stegall, Yartzoff, or Miller.

Second, Plaintiff alleges that Ball knew about her 2001 charge of discrimination against Peterson, and thus, Ball considered her an employee "with problems before." (Doc. 130, 6:9-11). In support, Plaintiff cites to Ball's deposition testimony that he created memoranda regarding Plaintiff and her performance "[t]he day she started" because she "had problems before." (Doc. 116, Ex. 4, Ball Dep. at 102:2-11). However, Ball's statement is insufficient to establish causation because Ball also testified that he did not learn of Plaintiff's discrimination complaint against Peterson until "several days," but "within a month," after she began working for Ball (Doc. 116, Ex. 3, Ball Dep. at 21:10-17). While Ball acknowledged that he learned of a conflict between Plaintiff and Peterson prior to Plaintiff returning to work, Ball testified that he was given no specifics as to the cause of the

conflict, or any information regarding a discrimination complaint (Id. at 22:1-6). Since Ball's decision to closely watch Plaintiff and keep memoranda regarding her performance occurred *prior* to his knowledge of her discrimination complaint, these actions could not be in retaliation for filing the complaint.[11] See Yartzoff, 809 F.2d at 1375 (stating that an employer's decision on a course of action made prior to learning of employee's protected activity does not give rise to inference of causation).

However, Ball later increased his supervision of Plaintiff which included meeting on a regular basis, giving Plaintiff specific instructions on how to improve her work, and reviewing her work product more carefully (Doc. 127, Ex. 1, Ball Dep. at 52:9-20, 57:14-18). While the timing of this increased supervision is unclear, it appears that it began after Plaintiff had been working for Ball for several months. Since Ball had learned of Plaintiff's complaint against Peterson by that time, there is a genuine issue of material fact whether his later increased supervision of Plaintiff was due to her protected activity or her substandard work performance.

Third, Plaintiff points to the fact that although Defendant found her complaint against Peterson unsubstantiated , the EEOC found reasonable cause to believe that Defendant had violated Title VII (Doc. 130, 6:11-13; Doc. 127, Ex. 7, 9). The Ninth Circuit recognizes that "an EEOC determination letter is 'a highly probative evaluation of an individual's discrimination complaint.'" Mondero v. Salt River Project, 400 F.3d 1207, 1215 (9th Cir. 2005) (citing Plummer v. W. Int'l Hotels Co., Inc., 656 F.2d 502, 505 (9th Cir. 1981)). Although an EEOC determination letter is highly probative, it "does not support [a plaintiff's] contention that an EEOC determination letter is somehow a free pass through summary judgment." Id. For instance, in Coleman v. Quaker Oats Co., the Ninth Circuit

---

[11]It is worth noting that in the 2002 performance evaluation that followed closest in time after Ball learned of Plaintiff's discrimination complaint, Plaintiff was given a rating of "G" (Doc. 116, Ex. 8). A "G" rating represents "Good Solid Performance — Fully met expectations in all prioritized areas of performance plan." (Id.) If the knowledge of Plaintiff's discrimination complaint against Peterson caused Ball to act retaliatory toward Plaintiff, one would expect the performance evaluation to reflect that animus.

found that the EEOC letter at issue did not address what facts the EEOC considered and how it analyzed them. 232 F.3d 1271, 1284 (9th Cir. 2000). Recognizing the law of other circuits who had examined similarly conclusory EEOC letters, the Ninth Circuit held that when an EEOC letter only reports "bare conclusions," it has little probative value and cannot by itself create a genuine issue of material fact. Id. (citations omitted).

Here, the EEOC determination letters by themselves do not create a genuine issue of material fact, and they do not serve as a "free pass through summary judgment." Mondero, 400 F.3d at 1215. Importantly, the EEOC based its determination on Plaintiff's October 2001 charge (Doc. 127, Ex. 9). This charge was one of gender discrimination against Peterson, rather than retaliation (Doc. 127, Ex. 8). Thus, the EEOC did not find good cause to believe Defendant had retaliated against Plaintiff for filing EEOC complaints, the charge in the present action.

Fourth, Plaintiff states that Ball blamed her for the problems with Peterson, and treated her differently than other employees (Doc. 130, 6:13-15). While Plaintiff was required to check in and out each day, this requirement was imposed because Plaintiff disappeared for long periods of time, not for any discriminatory reason (Doc. 116, Ex. 15, Ball Dep. at 52:21-53:7, 53:17-22).[12] There is also no indication that the requirement that she log off her work computer each day was imposed for any discriminatory reason. The Information Technology department required employees to log off their computers at the end of the day to allow them to perform maintenance work (Id. at 53:8-16). Instead, Plaintiff would lock her computer and not log off which inhibited the IT staff in its work (Id.). Similarly, there is no evidence that the restriction that Plaintiff not solicit work from other departments without Ball's approval was discriminatory. Upon Ball learning that Plaintiff was volunteering for projects in other departments, he restricted her from accepting outside

---

[12]Plaintiff admitted at her deposition that when Ball asked her about her clocking in and clocking out practices, she "yelled at . . .Roger" and claimed that he was trying to "ding" her "on time" (DSOF ¶ 49; Doc. 127, Ex. 17, 164:11-15).

projects due to her inability to complete her assigned work and failure to seek approval through the chain of command (Doc. 127, Ex. 1, Ball Dep. at 61, 63, 147-48).

However, there is evidence that the prohibition on Plaintiff staying past 6 p.m. was imposed due to Plaintiff's actions against Maricopa County (Doc. 116, Ex. 15, Ball Dep. at 54:13-24). In his deposition, Ball testified that there were several reasons for the prohibition. He stated, "One is just safety. Everybody was gone, and the building was basically vacant. But also there were some concerns. She had already filed some actions against the County, and she was the only employee left. And I think there was concern that that was not a good business practice." (Id. at 54:19-24). Upon follow-up questioning, Ball confirmed that the ongoing legal issues that Plaintiff raised with the County was part of his concern that led to the restriction (Id. at 54:25-55:5). This testimony presents a genuine issue of material fact whether Ball's reasons for imposing certain requirements on Plaintiff, including staying past 6 p.m., was tied to her ongoing complaints against Defendant.

Fifth, Plaintiff alleges that Ball began consulting with superiors, human resources and the county attorney early on in his supervision of Plaintiff (Doc. 130, 6:16-17; PSOF ¶ 5). However, there is no evidence that these discussions were held in retaliation for Plaintiff's complaints. The portion of Ball's deposition cited by Plaintiff shows that Ball sent an email to the county attorney's office after Plaintiff refused to sign her July 20, 2003 performance evaluation (Doc. 116, Ex. 5, Ball Dep. at 138:23-139:18). Consulting with counsel following such an event would be appropriate, and does not demonstrate any retaliatory animus.

Finally, Plaintiff alleges that shortly after Plaintiff filed her 2001 charge and spoke out at the TTH meeting, Ball gave her a less than satisfactory performance evaluation (Doc. 116, 6:13-15; PSOF ¶¶ 8, 11). The Court finds that a genuine issue of material fact is created in regards to the July 20, 2003 performance evaluation. Although Plaintiff filed her gender discrimination claim with the EEOC on October 3, 2001, the reasonable cause determination as to that charge was not issued until March 28, 2003 (Doc. 127, Ex. 9). Then, on June 24, 2003, Plaintiff attended the TTH meeting where she was critical of the OATTN program

(PSOF ¶ 9). Several weeks later, on July 20, 2003, Plaintiff received a performance evaluation that was lower than her previous one (Doc. 127, Ex. 11).

Plaintiff alleges that this lower performance evaluation was retaliatory and based on Plaintiff's prior EEOC charge. As to temporary proximity, this approximately four-month time period may be insufficient by itself to establish the necessary nexus. However, Plaintiff has made a showing sufficient to infer that the decision makers were aware of her protected activity. See Raad, 323 F.3d at 1197. Ball testified at his deposition that he learned of Plaintiff's complaint within a month after she started working for him (Doc. 116, Ex. 3, Ball Dep. at 21:10-17). He also testified that he learned of the EEOC's reasonable cause determination shortly after it was issued. Both of these events placed Ball on notice of Plaintiff's protected activity and create a question of fact whether the lower performance review was retaliatory. The Court finds that Plaintiff has raised a genuine issue of material fact regarding a causal link because she presents evidence to support an inference of causation.

### b. Legitimate Non-Discriminatory Reason and Pretext

Once the plaintiff establishes a prima facie retaliation claim, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions. Ray, 217 F.3d at 1240. Defendant articulates several legitimate, non-discriminatory reasons for Plaintiff's warnings and ultimate termination. First, Defendant points to Plaintiff's unsatisfactory performance and inability to meet deadlines. According to Defendant, Plaintiff missed numerous deadlines which forced Ball to extend her deadlines "more than once — even after she agree[d] to the original ones." (DSOF ¶ 21) Plaintiff also produced "poor quality" work that "just did not look good." (Id. ¶¶ 15-19). Second, Defendants argue that Plaintiff exhibited insubordinate behavior and a lack of respect for her supervisors. Plaintiff referred to Department of Transportation managers as "assholes" and Ball as "Roger no Balls," "two-faced," and a "dick." (Id. ¶¶ 41-44). Plaintiff also did not get along with her coworkers and was not a team player (Id. ¶¶ 27-30). Finally, Plaintiff refused to follow orders. Plaintiff required more supervision than other employees because she would "disappear for long

periods of time throughout the workday," refused to follow Department of Transportation policies, and disobeyed orders from supervisors (Id. ¶¶ 34-35, 40, 47-51, 53, 55-61, 64-67). The Court finds that Defendant has articulated several legitimate, nondiscriminatory reasons for the adverse employment actions taken against Plaintiff. Thus, Plaintiff bears the ultimate burden of demonstrating that those reasons were merely pretext for a discriminatory motive. See Ray, 217 F.3d at 1240.

"A plaintiff can show pretext directly, by showing that discrimination more likely motivated the employer, or indirectly, by showing that the employer's explanation is unworthy of credence" because it is inconsistent or otherwise not believable. Vasquez v. County of Los Angeles, 349 F.3d 634, 641 (9th Cir. 2003); Dominguez-Curry, 424 F.3d at 1037. "Direct evidence 'is evidence which, if believed, proves the fact of discriminatory animus without inference or presumption.'" Aragon v. Republic Silver State Disposal, Inc., 292 F.3d 654, 662 (9th Cir. 2002) (quoting Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1221 (9th Cir. 1998)). In general, direct evidence "consists of clearly sexist, racist, or similarly discriminatory statements or actions by the employer." Coghlan v. Am. Seafoods Co., 413 F.3d 1090, 1095 (9th Cir. 2005) (citations omitted). Where direct evidence is present, "'a triable issue as to the actual motivation of the employer is created even if the evidence is not substantial.'" Aragon, 292 F.3d at 662 n.5 (quoting Godwin, 150 F.3d at 1221). Moreover, where an individual who exhibits bias has significant influence or leverage over the formal decision maker, such direct evidence is sufficient evidence of discrimination to defeat summary judgment. Dominguez-Curry, 424 F.3d at 1040 n.5. "To show pretext using circumstantial evidence, a plaintiff must put forward specific and substantial evidence challenging the credibility of the employer's motives." Vasquez, 349 F.3d at 642 (citations omitted); Nilsson v. City of Mesa, 503 F.3d 947, 954 (9th Cir. 2007); Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1222 (9th Cir. 1998) (citations omitted) ("[Circumstantial] evidence of 'pretense' must be 'specific' and 'substantial' in order to create a triable issue with respect to whether the employer intended to discriminate").

In discussing pretext, Plaintiff states that "it is for a jury to decide whether Ball's criticism of [Plaintiff's] performance and his accusations of insubordination were genuine in light of the clear evidence that he treated her differently than he treated other employees throughout his supervision of her" (Doc. 130, 8:20-23). Plaintiff points to Ball's increased supervision of her and consultation with others regarding her performance as evidence of pretext (Id. 8:23-25). In its reply, Defendant contends that Plaintiff has produced no evidence, let alone specific and substantial circumstantial evidence, that Defendant treated her differently for discriminatory reasons or that Defendant's reasons for warning or terminating her were pretextual (Doc. 128, 8:15-19).

Plaintiff's evidence regarding pretext appears to be the same used to support her prima facie case of retaliation. As the same evidence that makes out a prima facie case may be relied upon to establish pretext, though, the Court will treat Plaintiff's allegations regarding her prima facie claim as her position regarding pretext. See Miller, 797 F.2d at 732 ("To show pretext, the plaintiff is not necessarily required to introduce evidence beyond that already offered to establish her prima facie case, although she may of course provide additional proof of the defendants' unlawful motivation.") (citations omitted); Lowe v. City of Monrovia, 775 F.2d 998, 1008 (9th Cir. 1985) ("The trial of fact may consider the same evidence that the plaintiff has introduced to establish a prima facie case in determining whether the defendant's explanation for the employment decision is pretextual.") (citation omitted).

Plaintiff has provided no direct evidence of retaliation, but rather, has relied only upon circumstantial evidence. Plaintiff argues that Ball treated her differently from other employees under his supervision because she "had problems before." While Plaintiff lacks evidence showing that many of Ball's restrictions were imposed for retaliatory reasons, there is a genuine issue of material fact regarding Ball's prohibition against staying past 6 p.m. Based upon Ball's deposition testimony, it is clear that part of the reason for the restriction was due to Plaintiff's ongoing legal claims against Maricopa County. Moreover, Ball's increased supervision appears to have begun after Ball learned of Plaintiff's 2001

discrimination complaint against Peterson.  Additionally, the short temporal proximity between the EEOC's reasonable cause determination on March 23, 2003, the TTH meeting on June 24, 2003 and the lowered performance evaluation on July 20, 2003 create a question of fact whether the performance evaluation was influenced by a retaliatory motive.

While these time-barred acts are not actionable in themselves, they are relevant as indirect proof of Defendant's intent to retaliate against Plaintiff for filing discrimination complaints.  This evidence is also relevant for its probative value in assessing whether Defendant's justifications for its present conduct lack credibility.  These acts suggest that Ball may have had a retaliatory motive that led to Plaintiff's written warnings and termination. The issue of an employer's motivations is one more appropriately left for a jury. "Courts have recognized that in discrimination cases, an employer's true motivations are particularly difficult to ascertain, thereby making such factual determinations generally unsuitable for disposition at the summary judgment stage." Miller, 797 F.2d at 732-33.

In conclusion, Plaintiff has produced some evidence that Defendant's reasons for the written warnings and termination were merely pretext for a discriminatory motive, and thus, summary judgment will be denied.  See Ray, 217 F.3d at 1240.  The Court's holding that summary judgment is inappropriate on the retaliation claim, however, should not be seen to suggest that Plaintiff will succeed at trial.  In the face of strong evidence presented by Defendant showing legitimate reasons for its actions, Plaintiff's evidence appears weak.  If her proof fails to sustain the claim of retaliatory employment practices, Plaintiff may well suffer judgment for defense costs and attorney's fees.

### 3.    Mixed-Motive

Cases where an employer's action is motivated by a combination of legitimate and illegitimate motives are referred to as mixed-motive cases.  Stegall, 350 F.3d at 1067.  The U.S. Supreme Court originally articulated the burden-shifting framework for mixed-motive Title VII cases in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989).  In a plurality opinion, five justices agreed that where a plaintiff carries her burden to show that an illegitimate motive "played a motivating part in an employment decision, the defendant may avoid a

finding of liability only by proving that it would have made the same decision even if it had not allowed gender to play such a role." Id. at 244-45 (plurality opinion). Price Waterhouse established a full affirmative defense for employers who could prove that the same decision would have been made regardless of impermissible discrimination. In Stegall, the Ninth Circuit applied Price Waterhouse to a mixed-motive retaliation claim and described the burden allocation as follows:

> Under Price Waterhouse, the plaintiff must show that it is more likely than not that a protected characteristic played a motivating part in the employment decision. Once that is done, the employer may escape liability only by proving by way of an affirmative defense that the employment decision would have been the same even if the characteristic had played no role.

350 F.3d at 1068 (citations and internal quotations omitted).

Plaintiff asserts, without much explanation, a mixed-motive theory in opposition to Defendant's motion for summary judgment (Doc. 130, 9:1-4). Since Defendant has offered multiple reasons for firing Plaintiff, yet the Court finds that the record in this case supports a finding that Defendant had illegitimate motives, this case can be examined as one involving "mixed motives." See Price Waterhouse, 490 U.S. at 244-45. The evidence submitted by Plaintiff reveals that her protected activity was likely a "motivating factor" in her warnings and termination. At the very least, Plaintiff has raised a triable issue about Defendant's motivations. Thus, Defendant may escape liability only by proving that the employment decision would have been the same even if the characteristic had played no role. Stegall, 350 F.3d at 1068. If Defendant is successful in proving this affirmative defense, then he may not be liable. Id.

**D.     Violation of Section 1983 (Count IV)**

Plaintiff asserts that Defendant retaliated against her for statements she made at the June 24, 2003 TTH meeting, and that this retaliation violated her First Amendment right to free speech (2d Amend. Compl. ¶¶ 36, 38). Plaintiff initially brought suit against both Maricopa County Department of Transportation and her supervisor, Ball. However, Ball was subsequently dismissed, which left only the Department of Transportation as a defendant.

Defendant's summary judgment (Doc. 126) and Plaintiff's response both failed to address the liability of a municipality under section 1983 (Doc. 130).

In Monell v. Department of Social Services of New York, the Supreme Court held that persons subject to suits under section 1983 include municipalities and other local governing bodies. 436 U.S. 658, 690 (1978). A municipality's liability under Monell may be premised on any one of three distinct theories: (1) a municipal employee was acting pursuant to an expressly adopted official policy; (2) a municipal employee was acting pursuant to a longstanding custom or practice; or (3) a municipal employee was acting as a "final policy maker." Webb v. Sloan, 330 F.3d 1158, 1164 (9th Cir. 2003). Defendant's reply only briefly addresses the first theory based upon an official policy (Doc. 128, 5:3-14). Plaintiff sought leave to file a surreply (Doc. 119), which the Court denied (Doc. 124). Plaintiff's surreply purported to argue the third theory, that Michael Ellgood was a "final policymaker" for Defendant (Doc. 119).

Since Defendant's liability under the Monell line of cases was not addressed until the reply, the Court will deny Defendant's motion as to this claim. However, the Court will allow the parties, if they choose, to file a second summary judgment motion solely discussing Plaintiff's section 1983 claim. In this new motion, the Court cautions the parties to be specific as to each element of a section 1983 claim and how it is or is not satisfied, as well as municipal liability under the three theories, as appropriate. Broad, conclusory allegations are not sufficient; rather specific citations to supporting evidence must be provided to the Court.

**E.      Intentional Infliction of Emotional Distress (Count 5)**

In order to prevail on a claim of intentional infliction of emotional distress ("IIED") under Arizona law, a plaintiff must prove three elements: "[F]irst the conduct by the defendant must be "extreme" and "outrageous"; second, the defendant must either intend to cause emotional distress or recklessly disregard the near certainty that such distress will result from his conduct; and third, severe emotional distress must indeed occur as a result of defendant's conduct. Citizen Publ'g Co. v. Miller, 210 Ariz. 513, 516, 115 P.3d 107, 110

(2005) (en banc) (quoting <u>Ford v. Revlon</u>, Inc., 153 Ariz. 38, 43, 734 P.2d 580, 585 (1987)); <u>Johnson v. McDonald,</u> 197 Ariz. 155, 160, 3 P.3d 1075, 1080 (Ct. App. 1999)(quoting <u>Ford</u>, 153 Ariz. at 43, 734 P.2d at 585).

For the first element, a plaintiff must show that the defendant's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." <u>Johnson</u>,197 Ariz. at 160, 3 P.3d at 1080 (quoting <u>Cluff v. Farmers Ins. Exch.</u>, 10 Ariz. App. 560, 562, 460 P.2d 666, 668 (Ct. App. 1969)). "Even if a defendant's conduct is unjustifiable, it does not necessarily rise to the level of 'atrocious' and 'beyond all possible bounds of decency' that would cause an average member of the community to believe it was 'outrageous.'" <u>Nelson v. Phoenix Resort Corp.</u>, 181 Ariz. 188, 199, 888 P.2d 1375, 1386 (Ct. App. 1994) (citations omitted). This standard distinguishes "true claims from false ones, and . . . the trifling insult or annoyance from the serious wrong." <u>Godbehere v. Phoenix Newspapers, Inc.</u>, 162 Ariz. 335, 339, 783 P.2d 781, 785 (1989) (quotation omitted). The court determines whether the acts at issue are sufficiently outrageous to state a claim for relief. <u>Johnson</u>, 197 Ariz. at 160, 3 P.3d at 1080 (citing <u>Mintz v. Bell Atl. Sys. Leasing Int'l, Inc.</u>, 183 Ariz. 550, 554, 905 P.2d 559, 563 (Ct. App. 1995)). Only if reasonable minds could differ about whether the conduct is sufficiently outrageous does the jury decide the issue. <u>Id.</u> In the employment context, "it is extremely rare to find conduct . . . that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress." <u>Mintz</u>, 183 Ariz. at 554, 905 P.2d at 563 (quoting <u>Cox v. Keystone Carbon Co.</u>, 861 F.2d 390, 395 (3d Cir. 1988), <u>cert. denied</u>, 498 U.S. 811 (1990)).

In this case, Plaintiff alleges that she suffered severe emotional distress as a result of Ball being allowed to "oppress her for two years with criticisms, . . . restrictions, . . . threats and ultimately with warnings and performance improvement plans, . . . when he had decided many months before that he wanted to fire her" (Doc. 130, 8:12-16). Plaintiff also alleges that Defendant stood by and allowed Ball's conduct to continue, thereby tacitly approving

it (Id. 8:12-18). In support, she cites the Arizona case of Ford v. Revlon and argues that it shows that an intentional infliction of emotional distress claim can be proved through evidence that an employer consistently ignored complaints that an employee was being harassed. 153 Ariz. at 43, 734 P.2d at 585.

The Arizona Supreme Court held in Revlon that it was extreme and outrageous when a company ignored repeated claims of sexual harassment by a distraught employee. 153 Ariz. at 43, 734 P.2d at 585. In that case, the plaintiff's supervisor repeatedly sexually harassed her. Id. at 40, 734 P.2d at 582. The plaintiff did "everything that could be done, both within the announced policies of [the company] and without, to bring this matter to [the company's] attention." Id. at 43, 734 P.2d at 585. Over ten separate attempts were made to report the supervisor's sexual harassment, but company officials, including a corporate Equal Employment Opportunity specialist, did nothing. Id. at 40-41, 734 P.2d at 582-83. During the harassment, the plaintiff's emotional distress progressed into physical health problems, including high blood pressure, chest pains, rapid breathing, and a nervous tic in her left eye, causing her to seek medical attention. Id. at 41, 734 P.2d at 583. The plaintiff ultimately attempted suicide due to the egregiousness of the harassment. Id. The company was held liable for the severe emotional distress the plaintiff experienced due to its continual ignorance and failure to remedy the situation. Id. at 43-44, 734 P.2d at 585-86.

Plaintiff has not shown that Defendant's treatment of her constituted "extreme" or "outrageous" conduct. The conduct alleged to have caused Plaintiff emotional distress occurred in the employment context, where it is extremely rare to find conduct that rises to the level of extreme and outrageous. See Mintz, 183 Ariz. at 554, 905 P.2d at 563. Additionally, Defendant's conduct involved behavior that a reasonable finder of fact would find less "outrageous" than other tortfeasors.[13] Plaintiff complains of constant criticisms she

---

[13]See also Craig, 496 F.3d at 1059(distinguishing plaintiff's case where a supervisor repeatedly propositioned her, followed her into the bathroom, grabbed her, and stuck his tongue in her mouth from other Arizona cases that did not find outrageous conduct); Nelson, 181 Ariz. at 199-200, 888 P.2d at 1386-87 (plaintiff did not provide evidence of outrageous

endured while working under Ball (Doc. 130, 8:13-14). The criticisms involved Ball's extra requirements and rules, including requiring Plaintiff to check out when she left for the evening, preventing her from staying past 6 p.m., requiring her to log off her work computer each day, and restricting her from soliciting work from other departments without seeking Ball's approval (PSOF ¶¶ 15,18; Doc. 116, Ex. 15, Ball Dep. at 52-57; Doc. 116, Ex. 18, Sabatini Dep. at 82-83). Having to endure these extra work requirements and rules to ensure good work habits is a far cry from the constant sexual harassment that occurred in <u>Revlon</u>.

Moreover, in determining outrageousness, Arizona courts may consider whether a defendant's actions are done for a legitimate business purpose. <u>Mintz</u>, 183 Ariz. at 554, 905 P.2d at 563. In <u>Mintz</u>, the Arizona Court of Appeals stated,

> The conduct, although it would otherwise be extreme and outrageous, may be privileged under the circumstances. The actor is never liable, for example, when he has done no more than insist upon his legal rights in a permissible way, even though he is aware that such insistence is certain to cause emotional distress.

<u>Id.</u> (quoting Restatement(Second) of Torts § 46, cmt. g). Defendant had a legitimate business reason for ensuring that Plaintiff's work was completed. Ball was Plaintiff's supervisor and that position imposed an obligation upon him to ensure that she completed her projects on time and in a satisfactory manner and followed Defendant's policies and rules. Defendant is not liable for any emotional distress suffered by Plaintiff due to Defendant's criticism of her substandard work performance and refusal to follow Ball's directives.

Finally, unlike <u>Revlon</u>, Plaintiff did not repeatedly complain to officials and receive no redress. She did not have to repeatedly complain, because Plaintiff's employer took immediate action after her first complaint (DSOF ¶¶ 8-10; Doc. 127, Ex. 6-7; Doc. 127, Ex.

---

and extreme conduct sufficient to survive summary judgment where plaintiff was called into office at 2:00 a.m., escorted by security to lobby and restroom, and fired in front of camera crews); <u>Mintz</u>, 183 Ariz. at 554, 905 P.2d at 563 (conduct of plaintiff's employer in failing to promote plaintiff, forcing plaintiff back to work sooner than doctor recommended, and hand delivering job reassignment letter to her in hospital cannot be regarded as atrocious and utterly intolerable in civilized society, even though employer knew of plaintiff's susceptibility to emotional problems).

1, Ball Dep. at 20). Plaintiff first reported a complaint to Maricopa County Human Resources on September 7, 2001 (DSOF ¶ 8, Doc. 127, Ex. 5). As a result, Defendant put her on a nine-month paid administrative leave while they investigated the matter (DSOF ¶ 9, Doc. 127, Ex. 6). After the initial investigation, Defendant took further action by assigning her to a different supervisor, Ball, to ensure that she would not have any contact with the supervisor she initially reported (DSOF ¶ 10; Doc. 127, Ex. 1, Ball Dep. at 20:11-22). Plaintiff broadly asserts that her employer "stood by and allowed Ball to oppress her for two years. . ." (Doc. 130, 8:13). Plaintiff does not, however, present any evidence of how her employer "stood by and allowed" this alleged conduct (Id.) Unlike in <u>Revlon</u>, the record does not show that Plaintiff continually made complaints to Defendant regarding Ball's conduct. Rather, Plaintiff points to complimentary communications regarding her work, received from fellow employees, while Ball was being critical (PSOF ¶ 17; Doc, 116, Ex. 17). Plaintiff also alleges that Sabatini suggested that she make formal requests through Ball for permission before assisting other departments (PSOF ¶ 18; Doc. 116, Ex. 18 Sabatini Dep. at 82-83). Therefore, Plaintiff shows no evidence that Defendant continuously ignored her complaints.

"In light of the extremely high burden of proof for demonstrating intentional infliction of emotional distress in Arizona," no reasonable jury could find Defendant's actions toward Plaintiff "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." See <u>Bodett v. CoxCom, Inc.</u>, 366 F.3d 736, 747 (9th Cir. 2004) (quoting <u>Cluff</u> 10 Ariz. App. at 562, 460 P.2d at 668); <u>Johnson</u>, 197 Ariz. at 160, 3 P.3d at 1080. As Plaintiff has not produced sufficient evidence on the first element, the Court need not address the second and third elements of her IIED claim. See <u>Nelson</u>, 181 Ariz. at 199, 888 P.2d at 1386 (even if second and third elements of an IIED claim are present, trial court must make a preliminary determination whether conduct may be considered extreme and outrageous). Because Plaintiff has not produced sufficient evidence of extreme and outrageous conduct,

the Court will grant summary judgment for Defendant on the intentional infliction of emotional distress claim.

**CONCLUSION**

Summary judgment is proper as to Plaintiff's sex discrimination, hostile work environment, and intentional infliction of emotional distress claims because she fails to make a showing sufficient to establish the existence of elements essential to her claim, of which she bears the burden of proof at trial. <u>Celotex</u>, 477 U.S. at 322. Plaintiff concedes that her sex discrimination claim should be dismissed as untimely filed. Next, Plaintiff's hostile work environment claim fails because she does not demonstrate harassment sufficiently severe or pervasive to be a hostile work environment. Plaintiff's intentional infliction of emotional distress claim fails because she cannot establish conduct sufficiently extreme and outrageous or that Defendant consistently ignored her complaints regarding Ball's conduct. However, the Court will deny summary judgment as to Plaintiff's retaliation claim because Plaintiff has present sufficient evidence to establish a prima facie case and to raise a reasonable inference that Defendant's proffered explanations may have been pretextual. As to Plaintiff's section 1983 claim, the Court will allow additional briefing by the parties since the issue of municipal liability was not addressed until the reply.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment is granted in part and denied in part (Doc. 126). Defendant's motion is granted as to the sex discrimination, hostile work environment, and intentional infliction of emotional distress claims (Claims I, II, and V). Defendant's motion is denied as to the retaliation and section 1983 claims (Claims III, IV).

**IT IS FURTHER ORDERED** that the parties may file any summary judgment motions regarding the section 1983 claim only by **March 5, 2010.** The deadlines for filing responses and replies are those laid out by the Federal Rules of Civil Procedure and the district's Local Rules.

- 33 -

DATED this 4th day of February, 2010.

Stephen M. McNamee
United States District Judge